**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **BOBBY OXFORD #1656735** | § | |
| | § | |
| **V.** | § | **W-17-CA-139-RP** |
| | § | |
| **UNIVERSITY OF TEXAS MEDICAL** | § | |
| **BRANCH, et al.** | § | |

## <u>ORDER</u>

Before the Court are the following: Plaintiff's Complaint (Doc. 1); Plaintiff's More Definite Statement (Doc. 9); Plaintiff's Supplements to the Complaint (Docs. 29, 31, & 43); Defendants Emma Delancey, Susan Waters, and Wanda Isbell's Motion for Summary Judgment Limited to Exhaustion of Administrative Remedies (Doc. 48); Defendant Dr. Juan Ortega-Barnett's Motion for Summary Judgment (Doc. 50); Plaintiff's Response to Dr. Ortega-Barnett's Motion for Summary Judgment (Doc. 53); Plaintiff's Miscellaneous Objection to Dr. Ortega-Barnett's Affidavit (Doc. 56); Defendants Emma Delancey, Susan Waters, and Wanda Isbell's Supplement to their Motion for Summary Judgment Limited to Exhaustion of Administrative Remedies (Doc. 58); Plaintiff's Miscellaneous Objection to Defendant Emma Delancey, Susan Waters, and Wanda Isbell's Motion for Summary Judgment Limited to Exhaustion of Administrative remedies (Doc. 62); and Plaintiff's Motion for Summary Judgment (Doc. 66). Plaintiff, proceeding *pro se*, has been granted leave to proceed *in forma pauperis*.

## <u>STATEMENT OF THE CASE</u>

Plaintiff Bobby Oxford ("Plaintiff") is a prisoner in the custody of the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID). He is presently confined in TDCJ's

1

William Boyd Unit. Plaintiff filed the instant lawsuit on May 22, 2017, alleging that the defendants were deliberately indifferent to his serious medical needs before, during, and after his back surgery.

Plaintiff names as defendants in this case Dr. Juan Ortega-Barnett, a surgeon at the University of Texas Medical Branch (UTMB) in Galveston, Texas, and three Boyd Unit employees: Emma Delancey, RN, Susan Waters, CCA, and Wanda Isbell, who has since transferred to a different unit (collectively, the "Boyd Unit defendants").[1] The allegations set forth in Plaintiff's Complaint, More Definite Statement, and supplemental pleadings are as follows.

Plaintiff began seeking medical care at the Boyd Unit for back pain beginning in 2014.[2] A doctor recommended soft-sole shoes, a back brace, and a foam mattress to alleviate Plaintiff's back pain, although it is unclear from the pleadings whether that doctor was Dr. Ortega-Barnett or someone else. According to Plaintiff, the Boyd Unit defendants refused to issue these items, causing Plaintiff's condition to worsen to the point where back surgery was necessary.

On February 19, 2015, Dr. Ortega-Barnett performed back surgery on Plaintiff. Plaintiff alleges Dr. Ortega-Barnett was "careless" during the surgery and cut the nerves and muscles in Plaintiff's back. (Doc. 9 at 1). Plaintiff further alleges that, while he had feeling in both legs and feet prior to surgery, when he woke up after the surgery, he could not feel his left leg or foot.

After Plaintiff told Dr. Ortega-Barnett he had no feeling in his left leg or foot, Dr. Ortega-Barnett ordered a CT scan of Plaintiff's back. Two days after the surgery, a therapist evaluated Plaintiff to see if he could walk. At that time, Plaintiff could only walk two steps by holding onto

---

[1] Although Plaintiff names "UTMB" as a defendant on the first page of his Complaint, Plaintiff does not assert any claims against UTMB. *See* Doc. 1.

[2] Elsewhere in his pleadings, Plaintiff states he began seeking medical care for back pain as early as 2010.

a railing due to the loss of feeling in his left leg. Plaintiff alleges that, although a nurse called Dr. Ortega-Barnett to tell him Plaintiff could not walk, Dr. Ortega-Barnett ordered Plaintiff's release from the hospital without providing Plaintiff a cane or walker to assist Plaintiff with walking. Plaintiff asserts he has not been evaluated by Dr. Ortega-Barnett again in person, nor has he undergone a physical examination since the surgery, although Plaintiff states he has consulted with Dr. Ortega-Barnett on various occasions via video conference technology.

Several days after the surgery, Plaintiff returned to the Boyd Unit, where a nurse named Mrs. Hubbard gave Plaintiff a walker. However, about seven days later, the Boyd Unit defendants confiscated the walker because Plaintiff had no record of the walker having been issued to him. Thirty minutes after the walker was confiscated, the walker was returned to Plaintiff.

Roughly a month after his February 19, 2015 back surgery, Plaintiff told Waters he could not attend a scheduled therapy session because had a deadline to submit a brief in court. Plaintiff asserts that Waters instructed Plaintiff to sign a "refusal" of therapy without telling him that he could sign a "reschedule" instead. Further, according to Plaintiff, Dr. Ortega-Barnett told Waters to schedule Plaintiff for therapy at least three times, but she refused to do so. It is unclear from Plaintiff's pleadings when this took place.

On July 31, 2015, Plaintiff was called to the Boyd Unit medical department to give up his walker. Once there, he asked who ordered the walker to be taken, but there was no reply. According to Plaintiff, the woman at the medical department who took the walker "looked behind her to where Ms. Isbell, Ms. Waters and Ms. Delancey were standing, then she said she was to take the walker." (Doc. 9 at 4).

3

After his walker was confiscated, Plaintiff tried several times to obtain a cane, but he was refused one. According to Plaintiff, all of the Boyd Unit defendants had a part in refusing the cane. Specifically, Plaintiff alleges he asked Isbell about a cane, and she instructed him to request one via an I-60. Plaintiff states he submitted several I-60s from July 30, 2015, to March 8, 2016, but they were all denied. Plaintiff further states that a "Dr. Williams" ordered Plaintiff be provided a cane on May 19, 2016, but the Boyd Unit Defendants refused to issue the cane until June 7, 2016, after Plaintiff threatened to file an I-60. As of the filing of this lawsuit, Plaintiff was still using a cane for balance.

After the filing of his Complaint and More Definite Statement, Plaintiff filed various supplemental pleadings in which he alleges additional claims against Delancey based on events that occurred in 2017. Plaintiff's Supplemental Complaint alleges the following:

> On 2/9/17, Ms. Delancey denied plaintiff to see PA for allergy medication. On 2/19/17 both legs went numb. On 3/1/17 mental health refused medication. On 3/23/17 cat scan and mylagram. On 5/8/17 Ms Delancey denied medication. On 8/9/17 scheduled nurse sick call to refill chronic medication (meloxican [*sic*] for back pain), to which is chronic so a nurse sick call is not required. On 11/22/17 put in chronic care for renewal of medication (meloxican [*sic*]), on 12/4/17 put in again for meloxican [*sic*], several I-60s was put in to renew the meloxican [*sic*] and when plaintiff wrote to the Court for Court order, Plaintiff finally received the medication (meloxican [*sic*]) for his back pain on 12/22/17.

(Doc. 43). Further, in another supplemental pleading, Plaintiff alleges, in a single sentence, that Delancey is retaliating against him. (Doc. 29).

In all, Plaintiff maintains he has had no treatment for his back since the surgery. Further, Plaintiff states that every time he visits with Dr. Ortega-Barnett via video conference technology, Dr. Ortega-Barnett recommends soft sole footwear, a back brace, a foam mattress, therapy, and muscle relaxers for Plaintiff, but the Boyd Unit defendants refuse to provide it.

4

Plaintiff alleges Dr. Ortega-Barnett was deliberately indifferent to his serious medical needs by cutting the nerves in Plaintiff's back during surgery and for releasing him from the hospital prematurely without a cane or walker. Plaintiff further alleges the Boyd Unit defendants were deliberately indifferent to his serious medical needs by refusing him adequate medical care, including medication, a walker and cane, soft sole footwear, a back brace, a foam mattress, and therapy.

As a result of the defendants' conduct, Plaintiff alleges he suffers from muscle tightness in his left leg, even when walking only short distances, constant pain from his muscles on his left side, and numbness from his left hip to his toes. In addition, Plaintiff has trouble sleeping due to sharp pain that shoots from his back to his toes once he lays down. Plaintiff cannot lift more than twenty pounds without experiencing tremendous pain in his legs. Finally, Plaintiff alleges the defendants' conduct caused him severe emotional distress, mental anguish, grief, fright, humiliation, fury, and great pain. He seeks damages in the amount of $100,000.00 from each defendant.

On December 11, 2017, Dr. Ortega-Barnett filed a Motion to Dismiss the Complaint. (Doc. 30). Thereafter, the Court entered an order giving notice that it would treat Dr. Ortega-Barnett's motion to dismiss as a motion for summary judgment and ordered Dr. Ortega-Barnett to file any additional summary judgment evidence. (Doc. 33). Defendants Delancey, Waters, and Isbell filed a Motion for Summary Judgment Limited to Exhaustion of Administrative Remedies and Supplement to the Motion (Docs. 48 and 58), to which Plaintiff filed a Response (Doc. 53). Dr. Ortega-Barnett filed a Motion for Summary Judgment (Doc. 50), to which Plaintiff filed Responses (Docs. 53 & 56). Plaintiff also filed a "Motion for Summary Judgment" (Doc. 66) and an additional pleading titled "Plaintiff's Statement and Objection to Defendant Juan Ortega-Barnett M.D.'s Response." (Doc. 67).

5

DISCUSSION AND ANALYSIS

A.      Summary Judgment Standard

A court will, on a motion for summary judgment, render judgment if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). When a motion for summary judgment is made and supported, an adverse party may not rest upon mere allegations or denials but must set forth specific facts showing there is a genuine issue for trial. *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 433 (5th Cir. 1995); FED. R. CIV. P. 56.

Both movants and non-movants bear burdens of proof in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The movant with the burden of proof at trial must establish every essential element of its claim or affirmative defense. *Id.* at 322. In so doing, the moving party without the burden of proof need only point to the absence of evidence on an essential element of the non-movant's claims or affirmative defenses. *Id.* at 323-24. At that point, the burden shifts to the non-moving party to "produce evidence in support of its claims or affirmative defenses . . . designating specific facts showing that there is a genuine issue for trial." *Id.* at 324. The non-moving party must produce "specific facts" showing a genuine issue for trial, not mere general allegations. *Tubacex v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).

In deciding whether to grant summary judgment, the Court should view the evidence in the light most favorable to the party opposing summary judgment and indulge all reasonable inferences in favor of that party. The Fifth Circuit has concluded "[t]he standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational

6

trier of fact could find for the non-moving party based upon the evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). To the extent facts are undisputed, a Court may resolve the case as a matter of law. *Blackwell v. Barton*, 34 F.3d 298, 301 (5th Cir. 1994).

Although the Court is not required to sift through the summary judgment evidence to find support for the opposition to a motion for summary judgment, in light of Plaintiff's *pro se* status, the Court has reviewed all evidence submitted by both sides and evaluated it carefully with respect to the controlling law and relevancy to Plaintiff's claims.

B.    Deliberate Indifference

Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. *Baker v. McCollan*, 443 U.S. 137 (1979). As the United States Fifth Circuit Court of Appeals has observed, "'[I]t is fundamental to our federal jurisprudence that state law tort claims are not actionable under federal law; a plaintiff under section 1983 must show deprivation of a federal right.'" *Price v. Roark*, 256 F.3d 364, 370 (5th Cir. 2001) (quoting *Nesmith v. Taylor*, 715 F.2d 194, 196 (5th Cir. 1983)). Prison officials violate the constitutional prohibition against cruel and unusual punishment when they demonstrate deliberate indifference to a prisoner's serious medical needs, constituting an unnecessary and wanton infliction of pain. *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

To establish deliberate indifference in the context of the Eighth Amendment, an inmate must show that the defendants (1) were aware of facts from which an inference of an excessive risk to an inmate's health or safety could be drawn and (2) drew an inference that such potential for harm existed. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Thus, a prison official acts with deliberate

7

indifference "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. The second prong of this analysis is a subjective test that requires a prison official to have a culpable state of mind for their act or omission to constitute deliberate indifference. *Brennan*, 114 S.Ct. at 1979. A prison official must know of and recklessly disregard an excessive risk to inmate health and safety to have a sufficiently culpable state of mind. *Id.* at 1980.

Deliberate indifference is "an extremely high standard to meet." *Domino v. Tex. Dept of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Unsuccessful medical treatment or disagreement between an inmate and his doctor concerning the manner of treatment does not give rise to a cause of action, absent exceptional circumstances. *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). A claim that additional diagnostic techniques or forms of treatment should have been utilized is also inadequate for purposes of § 1983. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). In short, a claim of medical malpractice does not amount to a constitutional violation merely because the plaintiff is a prisoner. *Id.* at 106. In order to maintain a claim for delayed medical treatment there must have been deliberate indifference which results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993).

C.    Dr. Ortega-Barnett's Motion for Summary Judgment

Dr. Ortega-Barnett moves for summary judgment on the following grounds:

1.    Tex. Civ. Prac. & Rem. Code §§ 101.106(a) & (f) deprive the Court of jurisdiction over Plaintiff's claims;

2.    There is no genuine dispute of material fact as to Dr. Ortega-Barnett's alleged Eighth Amendment violations;

8

      3.      Plaintiff's claims against Dr. Ortega-Barnett barred by the statute of limitations;

      4.      Plaintiff's failure to comply with the procedural requirements of TEX. CIV. PRAC. & REM. CODE § 74.351 requires dismissal of Plaintiff's claims;

      5.      Dr. Ortega-Barnett is entitled to qualified immunity; and

      6.      Plaintiff's claims against Dr. Ortega-Barnett are unexhausted.

(Doc. 50).

**Statute of Limitations**

Statute of limitations is a threshold issue; accordingly, the Court will address it first.[3] Because § 1983 has no statute of limitations provision, the Court looks to the state statute of limitations in personal injury cases. *Owens v. Okure*, 488 U.S. 235, 236 (1989). The applicable limitations period is two years in Texas. *Gonzales v. Wyatt*, 157 F.3d 1016, 1020 (5th Cir. 1998). The cause of action accrues, so that the statutory period begins to run, when the plaintiff knows or has reason to know of the injury which is the basis of the action. *Burrell v. Newsome*, 883 F.2d 416, 418 (5th Cir. 1989).

Plaintiff complains that Dr. Ortega-Barnett negligently cut the nerves in his back during the back surgery performed on February 19, 2015, leaving Plaintiff without feeling in his left leg and foot. Plaintiff further complains that Dr. Ortega-Barnett, knowing Plaintiff could not walk, released Plaintiff from the hospital roughly six days after his back surgery without providing any means to assist him in walking, such as a cane or walker.

---

[3] Dr. Ortega-Barnett also asserts, as a threshold matter, that this Court lacks jurisdiction over Plaintiff's claims pursuant to TEX. CIV. PRAC. & REM. CODE §§ 101.106(a) & (f) and that Plaintiff's claims are subject to dismissal for failure to timely comply with the requirements of TEX. CIV. PRAC. & REM. CODE § 74.351. Dr. Ortega-Barnett construes Plaintiff's claims as tort claims under Texas law, however, the plaintiff in this case specifically asserts federal claims pursuant to § 1983. Thus, Dr. Ortega-Barnett's reliance on Texas law is not relevant here and cannot serve as grounds for dismissal.

Here, the statute of limitations as to Plaintiff's claims against Dr. Ortega-Barnett began to run, at the latest, in March of 2015, when Plaintiff was released from UTMB after surgery and knew or had reason to know of his injury. The statute of limitations expired two years later in March of 2017. Plaintiff did not file the instant Complaint until May 22, 2017. Accordingly, Plaintiff's claims against Dr. Ortega-Barnett are time-barred and must be dismissed.

**Exhaustion**

Dr. Ortega-Barnett further asserts he is entitled to summary judgment on the grounds that Plaintiff has failed to exhaust administrative remedies as to the claims against him.

As amended by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." § 1997e(a). The Supreme Court held in *Woodford v. Ngo*, 548 U.S. 81 (2006), that the exhaustion remedy contained in the PLRA mandates "proper exhaustion," which means compliance with prison procedural rules and deadlines. *Id.* at 92-93. Further, the Fifth Circuit "has taken a strict approach to the exhaustion requirement." *Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003), overruled by implication on other grounds by *Jones v. Bock*, 549 U.S. 199, 214-15 (2007).

The Texas prison system has developed a two-step formal grievance process. *Johnson v. Johnson*, 385 F.3d 503, 515 (2004). The Step 1 grievance, which must be filed within fifteen days of the complained-of incident, is handled within the prisoner's facility. *Id.* After an adverse decision at Step 1, the prisoner has ten days to file a Step 2 grievance, which is handled at the state level. *Id.*

10

The Fifth Circuit has previously held that a prisoner must pursue a grievance through both steps for it to be considered exhausted.

The Fifth Circuit noted in *Johnso*n that it has given relatively little guidance on what a prisoner must say in a grievance to properly exhaust his claims and added that, as a general matter, courts typically use a standard according to which a grievance should give prison officials "fair notice" of the problem that will form the basis of the prisoner's suit:

> In deciding how much detail is required in a given case, we believe that a court must interpret the exhaustion requirement in light of its purposes, which include the goal of giving officials time and opportunity to address complaints internally. Thus, a grievance should be considered sufficient to the extent that the grievance gives officials a fair opportunity to address the problem that will later form the basis of the lawsuit.

*Id.* at 516-517 (internal quotations and citations omitted). The Fifth Circuit added that, as a practical matter, the amount of information necessary in the grievance would depend on the nature of the complaint. *Id.* at 517. If an inmate were complaining about the actions or inactions of a particular prison employee, he would ordinarily be expected to provide details regarding the identity of the employee and facts regarding the incident. *Id.* In contrast, if the inmate were complaining more generally about something like vermin in his cell or high prices in the commissary, the prison would be able to investigate the situation even if specific employees were not named. *Id.*

Dr. Ortega-Barnett adopts by reference the summary judgment evidence filed by the Boyd Unit defendants in support of their Motion for Summary Judgment Limited to Exhaustion of Administrative Remedies. Of the many Grievances Plaintiff filed during the relevant time period–explained in greater detail in the next section–not one complains that Dr. Ortega-Barnett cut Plaintiff's nerves during the back surgery or released him prematurely without any device to assist

in walking. Moreover, Plaintiff has failed, in response to Dr. Ortega-Barnett's Motion, to submit any summary judgment proof that he properly exhausted his claims. For these reasons, Plaintiff's claims against Dr. Ortega-Barnett are unexhausted.

**Deliberate Indifference**

In addition to finding that Plaintiff's claims against Dr. Ortega-Barnett are time-barred and unexhausted, the summary judgment record establishes no material issue of fact exists as to Plaintiff's claims of Eighth Amendment deliberate indifference against Dr. Ortega-Barnett.

The summary judgment evidence in this case establishes that Plaintiff's surgery was performed on February 19, 2015, after Plaintiff was informed of the procedure and its accompanying risks and gave his informed consent. Following the surgery, a CT scan of Plaintiff's lumbar spine was performed. There is nothing in the medical records to demonstrate the procedure was performed outside of the standard of care. In addition, Dr. Ortega-Barnett states in his affidavit that Plaintiff's nerves were not cut during the procedure and that, had this happened, there would have been immediate appearance of nerve damage to Plaintiff, such as paralysis, or loss of bladder and bowel control. A follow-up appointment on April 15, 2015, shows that Plaintiff "[h]ad some persistent LLE numbness postop in L5 distribution and subtle left dorsiflexion weakness postop but otherwise doing well. Back pain and radic improved. Ambulating with a walker." (Doc. 52 at 25).

In response to Dr. Ortega-Barnett's Motion, Plaintiff provides no evidence whatsoever to indicate that Dr. Ortega-Barnett inadvertently cut his nerves during surgery. Plaintiff provides only his lay conclusion, unsupported by medical evidence, that because he experienced numbness in his

left leg and foot following the surgery, Dr. Ortega-Barnett negligently cut the nerves in his back.[4] This is insufficient to overcome the record evidence to the contrary.

The evidence further shows that, following surgery, Plaintiff was evaluated daily by a neurosurgery team with Dr. Ortega-Barnett or another faculty member as the attending faculty supervisor at UTMB. By the sixth day following surgery, Plaintiff's condition had improved, he reported no pain and was ambulating. *Id.* at 103. Thus, he was deemed stable for discharge from the Neurosurgery Floor to the Transitory Care Unit (TCU), where inmates are admitted until they are ready to be returned to their prison unit. Dr. Ortega-Barnett provided the following discharge recommendations: physician to provide rolling walker in the unit; PT/OT in the unit: Keep incision clean and dry with gauze and soft tape; and pain control with Tylenol and anti-spasm medications. *Id.*

On the seventh post-operative day, February 26, 2015, Plaintiff was transferred to the TCU. In the TCU, Plaintiff's care was overseen by Boyd Unit doctors, who determined Plaintiff required no further inpatient rehabilitation, as he reported no pain. *Id.* at 122. Plaintiff was then discharged back to the Boyd Unit on March 2, 2015. The discharge recommendations were for the Unit to follow the recommendations Dr. Ortega-Barnett's team had set out and to "follow up with Dr. Ortega in 2 weeks in the TDCJ neurosurgery clinic." *Id.* at 179. Plaintiff was seen by UTMB neurosurgery in an office visit on April 15, 2015, and had visits via video conference technology on August 26, 2015, November 4, 2015, February 10, 2016, October 12, 2016, and February 8, 2017.

---

[4] It is also worth noting that the "careless" or "negligent" cutting of Plaintiff's nerves would not support a claim of deliberate indifference.

There is no competent summary judgment proof establishing that Dr. Ortega-Barnett refused to treat Plaintiff, ignored his complaints, intentionally treated him incorrectly, or engaged in any other conduct that would clearly show a wanton disregard for Plaintiff's serious medical needs. At most, Plaintiff alleges negligence, which is insufficient to establish a claim of deliberate indifference. Further, because Plaintiff fails to establish a material fact issue exists as to an Eighth Amendment violation, he cannot overcome Dr. Ortega-Barnett's assertion of qualified immunity. In sum, Plaintiff's claims against Dr. Ortega-Barnett are time-barred and unexhausted, and no rational trier of fact could find Dr. Ortega-Barnett was deliberately indifferent.[5] Accordingly, Dr. Ortega-Barnett is entitled to judgment as a matter of law.

> D.  The Boyd Unit Defendants' Motion for Summary Judgment Limited to Exhaustion of Administrative Remedies

The Boyd Unit Defendants move for summary judgment on the limited ground that Plaintiff has failed to properly exhaust his claims against them.

**Statute of Limitations**

Although the Boyd Unit Defendants do not assert the statute of limitations defense, the Court will, as a threshold matter, address the timeliness of Plaintiff's claims against them. *See Moore v. McDonald*, 30 F.3d 616, 620 (5th Cir. 1994) (A district court may *sua sponte* dismiss a complaint if it is clear from the complaint that the claims are time-barred). The Court finds that Plaintiff's claims against the Boyd Unit defendants are, in part, time-barred.

Plaintiff alleges that the Boyd Unit defendants denied him soft-sole shoes, a back brace, and a foam mattress, which caused Plaintiff's condition to worsen to the point where back surgery was

---

[5] It is not necessary to address the remaining grounds for summary judgment set forth in Dr. Ortega-Barnett's Motion for Summary Judgment.

necessary in February of 2015. Plaintiff further alleges that, roughly seven days after he returned to the Boyd Unit following his surgery, the Boyd Unit defendants confiscated his walker for thirty minutes before returning it to him. Plaintiff also alleges Waters instructed Plaintiff to sign a "refusal" of therapy instead of a "reschedule" in March of 2015.

These particular claims are barred by the statute of limitations. Plaintiff knew or had reason to know of his injury in March of 2015, at the latest. Therefore, the statute of limitations for these claims began to run in March of 2015 and expired in March of 2017. Plaintiff did not file his original Complaint until May 22, 2017. As such, the claims are time-barred and dismissal is proper.

The following claims against the Boyd Unit defendants are not barred by the statute of limitations: Plaintiff's claims arising from the confiscation of his walker in July of 2015; the subsequent denial of his requests for a cane and other items; and Plaintiff's claim that Delancey denied him allergy medicine and an unidentified medication in 2017.

**Exhaustion**

In support of their Motion for Summary Judgment Limited to Exhaustion of Administrative Remedies, the Boyd Unit defendants produced Plaintiff's TDCJ grievance records from January 1, 2015, through June 30, 2016.

The records indicate that, on January 22, 2015, Plaintiff filed Step One Grievance No. 2015079433. In this Grievance, Plaintiff asserts he asked a "Mr Kovac" about a missing cushion and told "Mr Kovac" that his feet and back are in pain and no one at the Boyd Unit has checked them. (Doc. 48-1 at 5). His Step One Grievance was returned on February 6, 2015. On February 12, 2015, Plaintiff filed a Step Two Grievance, in which he alleges that he saw a nurse practitioner named "Muldowney" on February 9, 2015, regarding his foot via video conference technology, however, Muldowney refused to treat Plaintiff and took his medications away. *Id.* at 3. The Step Two

Grievance was returned on March 3, 2015. There is no mention of any of the individual Boyd Unit Defendants in this Grievance.

On March 20, 2015, Plaintiff filed Step One Grievance No. 2015110689. In it, he alleges Isbell confiscated his walker when he visited the medical department for a follow-up appointment after his back surgery. (Doc. 48-1 at 15). He states he has no feeling in his left foot, and it is hard for him to keep his balance. The Step One Grievance was returned on May 14, 2015, however, Plaintiff did not file a Step Two Grievance.

On August 4, 2015, Plaintiff filed Step One Grievance No. 2015189375. In it, he alleges he was called to the medical department on July 31, 2015, and a "Ms. Lewis" confiscated his walker on the grounds that it was contraband. (Doc. 48-1 at 11).  He states his legs are still numb and he can barely walk. Plaintiff further complains in the Grievance that he has had problems in the past with medical because a "Ms. Mitchell" would tell the nurse practitioner that he was faking his back issues. The Step One Grievance was returned on October 9, 2015. In his Step Two grievance, Plaintiff complains he was refused the cane and soft-sole shoes that his surgeon requested he be given following surgery. His Step Two Grievance was returned on November 18, 2015. There is no mention of any of the individual Boyd Unit Defendants in either his Step One or Step Two Grievance.

On August 12, 2015, Plaintiff filed Step One Grievance No. 2015194287. (Doc. 48-1 at 13). In it, he alleges he saw Isbell on August 11, 2015, but he has had problems in the past with Isbell because Mrs. Mitchell told Isbell Plaintiff was faking his health issues. Plaintiff further alleges in the Grievance: "I have asked for a cane to assist me in walking until I got my feeling back in my left leg, due to at times when I walk I lose control over my leg, but as it is, Mrs. Isbell denied me the

proper care." *Id.* Plaintiff's Step One Grievance was returned on October 7, 2015. Plaintiff did not file a Step Two Grievance.

Plaintiff's other Grievances during this time period are not arguably related to the claims in this lawsuit.

The summary judgment evidence establishes Plaintiff failed to exhaust his claims against the Boyd Unit defendants asserted in his original Complaint. Grievance Nos. 2015079433 and 2015110689 pertain to conduct that occurred prior to March 20, 2015, which, as determined in the previous section, is barred by the statute of limitations. Moreover, in Grievance No. 2015079433, Plaintiff does not identify any of the defendants in this lawsuit. In Grievance No. 2015110689, Plaintiff identified Isbell by name, but he failed to pursue a Step Two Grievance.

In Grievance No. 2015189375, Plaintiff complains about his walker being confiscated in July of 2015 but does not provide any details that would provide prison officials with fair notice that any of the Boyd Unit defendants were responsible for it. In Grievance No. 2015194287, Plaintiff identified Isbell as the individual who denied him proper care, however, he failed to file a Step Two Grievance, and thus failed to pursue the grievance process through both steps as he is required to do for the claim to be considered exhausted. Moreover, Plaintiff has failed to produce any summary judgment evidence demonstrating his claims were properly exhausted.

After Plaintiff supplemented his Complaint to add new allegations against Delancey for denying him the opportunity to see a physician assistant for allergy medication on February 9, 2017, and for denying him unspecified medication on May 18, 2017, the Boyd Unit Defendants filed a Supplement to their Motion for Summary Judgment Limited to Exhaustion of Administrative Remedies, along with Plaintiff's grievance records from February 1, 2017, through December 31, 2017.

The records reveal that, on March 3, 2017, Plaintiff filed Step One Grievance No. 2017098228, alleging that "Ms. Aleman" refused him eye drops because her supervisor, Ms. Delancey, gave her strict and precise orders that TDCJ/UTMB must cut back on issuing medications regardless of their needs. (Doc. 58-1 at 25). The Step One Grievance was returned on March 9, 2017, and on March 14, 2017, Plaintiff filed a Step Two Grievance, which does not mention Delancey at all. The Step Two Grievance was returned on April 11, 2017.

On December 4, 2017, Plaintiff filed Step One Grievance No. 2018050998. In it, he states he requested a renewal of his Meloxicam on November 15, 2017. *Id*. at 9. He states he saw a "Mrs. Hubbard," who told him to file an I-60 for renewal of the Meloxicam, which he did on September 22, 2017, but never received it. He asserts he filled out another I-60, but he still did not receive the Meloxicam. He complains he has "been suffering pain daily because Ms. Delancey is retaliating against me over the lawsuit I filed on her."

Plaintiff received the Step One Grievance back on February 2, 2018, and on February 13, 2018, he filed a Step Two Grievance. In it, he states that "Ms. Delancey is putting (meds in clinic) on I-60s and that means nothing. Due to the fact they do not schedule you to see anyone. Therefore, this is inadequate medical care." (Doc. 58-1 at 7). On March 1, 2018, Plaintiff's Step Two Grievance was returned.

On December 7, 2017, Plaintiff filed an I-60 and Step One Grievance with this Court. (Doc. 29). In the cover letter, he states: "Enclosed is ORIGINAL I-60s and grievance that I just submitted due to not getting a refill on my pain meds as requested. As you will see Ms. Delancey is retaliating." (Doc. 29 at 1).

In the Step One Grievance, Plaintiff complains that, on November 15, 2017, he began requesting Meloxicam but did not receive it. When he asked "Mrs. Hubbard" about it, she told him

18

to put in an I-60, which he did, but his Meloxicam was never re-filled. Plaintiff further states he has been "suffering pain da[i]ly because Ms. Delancey is retaliating against me over the law suit I filed on her. If she would have provided adequate care, I would not had to file a suit." *Id.* at 2.

The Grievance was signed and dated by Plaintiff on December 4, 2017, however, there is no indication that the Grievance was ever filed with the appropriate prison authorities. In the I-60 Plaintiff enclosed, dated November 16, 2017, Plaintiff requests a Meloxicam re-fill and complains that he has had pain in his right side for three weeks.

Plaintiff's other Grievances during this time period are not arguably related to the claims in this lawsuit.

The summary judgment record establishes that Plaintiff also failed to exhaust his supplemental claims against Delancey. Although Grievance No. 2017098228 does indicate that Delancey generally instructed other providers to cut back on distributing medications, the Grievance does not fairly identify Delancey as the individual personally responsible for denying Plaintiff allergy medication. Plaintiff's Grievance No. 2018050998, which generally alleges that Delancey retaliated against him, was filed on December 4, 2017. However, in his supplemental pleadings, Plaintiff specifically complains that Delancey denied him medications in February and May of 2017. Accordingly,  Grievance No. 2018050998 is untimely under the rules and did not exhaust Plaintiff's supplemental claim. Finally, the Grievance and I-60 submitted to this Court as a supplement to Plaintiff's Complaint did not exhaust Plaintiff's claims. The supplement, filed December 7, 2017, is untimely. Moreover, filing a grievance with the Court instead of the TDCJ does not serve to exhaust a prisoner's administrative remedies. Plaintiff's supplemental claims are likewise unexhausted.

As a final note, this Court finds that, not only are Plaintiff's supplemental claims unexhausted, but they also fail to state a claim for relief. Under 28 U.S.C. § 1915(e)(2)(B)(i) & (ii), the district court shall dismiss an IFP complaint at any time if it determines that the complaint is frivolous or malicious or fails to state a claim upon which relief may be granted. *See Jones*, 549 U.S. at 202 (holding that Prison Litigation Reform Act mandates early judicial screening of prisoner complaints). Plaintiff's vague allegations that Delancey "denied plaintiff to see PA for allergy medication" on February 9, 2017, "denied medication" on May 8, 2017, and his allegation that Ms. Delancey "is retaliating" are insufficient to state a claim for deliberate indifference. (Doc. 29 at 1); (Doc. 43 at 4). Accordingly, to the extent his supplemental claims against Delancey are not exhausted, they nevertheless fail to state a claim upon which relief may be granted.

D.   Plaintiff's Motion for Summary Judgment

On May 17, 2018, Plaintiff filed a cover letter titled "Motion for Summary Judgment against Defendant Juan Ortega Barnett MD," however, no Motion is attached. (Doc. 66). On May 24, 2018, Plaintiff filed a pleading titled "Plaintiff's Statement and Objection to Defendant Juan Ortega-Barnett M.D.'s Response." (Doc. 67). This pleading does not allege facts establishing there is a genuine issue of fact for trial. Accordingly, Plaintiff's Motion for Summary Judgment is denied.

CONCLUSION

Plaintiff has failed to establish a genuine issue as to any material fact, and the defendants are entitled to judgment as a matter of law.

It is therefore **ORDERED** that Defendants' Motions for Summary Judgment (Docs. 48 and 50) are **GRANTED**. It is further **ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 66) is **DENIED**.

It is further **ORDERED** that all remaining Motions be dismissed as **MOOT**.

**SIGNED** on June 7, 2018.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE